283 N.J. Super. 372 (1995)
661 A.2d 1335
JOHN DOE, (A FICTITIOUS NAME) INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, PLAINTIFF,
v.
DEBORAH PORITZ, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division Burlington County.
Decided February 22, 1995.
*376 Furlong and Krasny, for plaintiff John Doe (John S. Furlong, Esquire, appearing).
Deborah T. Poritz, Attorney General of New Jersey for defendant (Deborah T. Poritz appearing and Madeleine W. Mansier, Esquire and Jane Grall, Esquire on the Brief).
Capehart and Scatchard, for the New Jersey Senate amicus curiae (Glenn R. Paulsen, Esquire, appearing).
WELLS, A.J.S.C.
The plaintiff, John Doe, was indicted and charged with molesting two teenage boys constituting sexual assault in June of 1985. *377 He entered into a plea agreement with the State of New Jersey for a term of imprisonment not to exceed 15 years. In or about September 1985, the plaintiff was examined by a psychologist at the Adult Diagnostic and Treatment Center (hereinafter, ADTC) in Avenel, New Jersey pursuant to R. 3:21-3. The Center determined his conduct was characterized by a pattern of repetitive and compulsive behavior. According to the plaintiff, he did not contest that determination since he knew he was to serve a term of incarceration anyway and believed he could benefit from a program of specialized treatment at the ADTC.
In February 1986, John Doe was sentenced to a ten year term of imprisonment at the ADTC in Avenel with a three year period of parole ineligibility. Plaintiff claims he fully participated in all aspects of the treatment program offered to him at ADTC. He eventually received the recommendation of his primary therapist and the concurring opinion of two staff panels. The plaintiff was recommended to the Special Classification and Review Board for a determination of parole eligibility. The Board interviewed the plaintiff in or about October 1991, determined he was "capable of making an acceptable social adjustment," and recommended to the New Jersey State Parole Board that he be released with supervised parole. The plaintiff was subsequently released on parole in January 1992.
Plaintiff claims he complied with all provisions of his parole release, including participation in aftercare psychological treatment. His sentence and parole requirements terminated in June of 1992. He now rents an apartment and works in the community. Apparently his employer and fellow employees are aware of his past.
On October 31, 1994, Governor Christine Todd Whitman signed into law the package of bills known as Megan's Law. Chapter 133, codified as N.J.S.A. 2C:7-1 et seq.
The New Jersey State Legislature enacted Megan's Law because it determined the "danger of recidivism posed by sex offenders and offenders who commit other predatory acts against *378 children, and the dangers posed by persons who prey on others as a result of mental illness, require a system of registration that will permit law enforcement officials to identify and alert the public when necessary for the public safety." N.J.S.A. 2C:7-1.a. It further determined that such a system would "provide law enforcement with additional information critical to preventing and promptly resolving incidents involving sexual abuse and missing persons." N.J.S.A. 2C:7-1.b.
Megan's Law requires persons convicted of certain sex offenses to register with the police. Registration involves notifying the police in the municipality wherein the registrant intends to reside of the following: name, social security number, age, race, sex, date of birth, height, weight, hair and eye color, fingerprints, address of legal residence, address of any current temporary residence, date and place of employment, date and place of each conviction, adjudication or acquittal by reason of insanity, indictment number, a brief description of the crime or crimes for which registration is required, and any other information that the Attorney General deems necessary to assess risk of future commission of a crime, including criminal and correction records, nonprivileged personnel, treatment, and abuse registry records, and evidentiary genetic markers when available. N.J.S.A. 2C:7-4.b.(1), (2) & (3).
Megan's Law has and may in the future affect John Doe in the following ways: First, since a court has found his conduct was characterized as repetitive and compulsive behavior, he must register with the police in the municipality of his residency, regardless of the date of the commission of the offense or the date of conviction. N.J.S.A. 2C:7-2.b.(1). Under sections of N.J.S.A. 2C:7-2.c.(4) and N.J.S.A. 2C:7-2.e, he must register within 120 days of the effective date of this Act and must verify his address with the appropriate law enforcement agency every 90 days. This 90-day provision is apparently experimental in nature since the legislature has ordered that the "Attorney General shall review, evaluate and, if warranted, modify pursuant to the `Administrative Procedures Act,'" the 90-day verification provision one year after *379 the effective date of the Act. He is to be subjected to these registration requirements for at least 15 years. N.J.S.A. 2C:7-2.f permits the plaintiff to apply to the Superior Court 15 years after conviction or release  whichever is later  to terminate the obligation to register upon proof that he has not committed an offense within that time period and is not likely to pose a threat to the safety of others. Finally, and most significantly, John Doe may be subject to N.J.S.A. 2C:7-5. That section authorizes law enforcement agencies to release relevant and necessary information in accordance with N.J.S.A. 2C:7-6 et seq., to the public when such release is "necessary for public protection."
N.J.S.A. 2C:7-6 et seq. outlines the manner in which community notification is to be implemented. N.J.S.A. 2C:7-8 directs the Attorney General, with the aid of a statutorily defined advisory council, to promulgate guidelines and procedures for the notification required under Megan's Law. The Attorney General, after consultation with the advisory council, has developed and issued the required guidelines which are now a part of the record. The validity of those guidelines has been questioned and that issue will be discussed towards the end of this opinion. Nonetheless, the Attorney General's guidelines identify factors relevant to the risk of re-offense and flesh out the three levels of notification provided for in the statute. The levels, or "tiers", require different levels of notification which correspond to the risk of re-offense. Under Tier I the risk of re-offense is determined to be low, and so only law enforcement agencies likely to encounter the registrant are notified. At Tier II the risk of re-offense is determined to be moderate and so organizations in the community, including schools, religious and youth groups are notified. At Tier III the risk of re-offense is determined to be high and so members of the public likely to encounter the person registered are notified. Of course each level expands upon the notification given under the previous tier.
John Doe, the plaintiff herein, filed a Complaint and an Order to Show Cause on January 3, 1995. His Order to Show Cause *380 demands that defendant Deborah Poritz, the Attorney General for the State of New Jersey, show cause why a preliminary injunction should not be granted, restraining and enjoining defendant or her agents and all law enforcement agencies under her authority from enforcing the registration and notification requirements of Megan's Law. N.J.S.A. 2C:7-1 et seq. Briefs were filed and oral argument was heard on that Order to Show Cause on January 20, 1995. Because of the complexity of the issues raised and the procedurally constrained nature of an application for a preliminary injunction, the court, sua sponte, ordered the parties to file cross motions for summary judgment. Both parties have filed the requested motions and both have submitted supplemental briefs. All sides agree that no material factual issues exist and that the case involves pure questions of law. Oral argument was scheduled for today, February 22, 1995.
The plaintiff's first amended complaint, filed on January 6, 1995, alleges that Megan's Law and the Attorney General's guidelines are unconstitutional as applied to plaintiff because they violate his rights under both the Federal and State Constitutions. Specifically, he alleges violations of the following constitutional protections: due process as provided by the Fifth and Fourteenth Amendments of the U.S. Constitution, as well as Art. 1, par. 1, of the State Constitution; violation of the ex post facto clause of the U.S. Constitution; violation of the Eighth Amendment of the U.S. Constitution and Art. 1, par. 12, of the State Constitution, both of which prohibit cruel and unusual punishment; violation of his right to privacy as created by N.J.S.A. 30:4-24.3; denial of his right to equal protection under the law as provided by the Equal Protection Clause of the U.S. Constitution and Art. 1, par. 1 of the State Constitution; and, violation of the protections against double jeopardy as provided by the Double Jeopardy Clause of the U.S. Constitution and Art. 1, par. 11 of the State Constitution. In addition to those constitutional challenges the plaintiff alleges that the State has breached the terms of his plea agreement by making additional, unnegotiated demands of him. Finally, the plaintiff alleges that the registration and notification requirements of Megan's *381 Law as against plaintiff would constitute a legal disqualification or disability because of his conviction, in violation of N.J.S.A. 2C:51-1, thereby depriving him of civil and statutory rights, under color of state law, in violation of 42 U.S.C. § 1983 as applied to the Privileges and Immunities Clause of the Fourteenth Amendment to the U.S. Constitution.

The Ex Post Facto Clause
The plaintiff has challenged Megan's Law under the ex post facto clause of the U.S. Constitution. Since New Jersey does not define ex post facto law any more expansively than the federal courts, my analysis under federal case law would serve to dispose of a State Constitutional challenge, as well. In re Kaplan, 178 N.J. Super. 487, 429 A.2d 590 (1981).
The ex post facto clause prohibits Congress and the States from enacting a law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." Weaver v. Graham, 450 U.S. 24, 28, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981); citing, Cummings v. Missouri, 4 Wall. 277, 325-326, 18 L.Ed. 356 (1867) (footnotes omitted). "This prohibition limits the powers of the states only with regard to the imposition of criminal punishment." In re Kaplan, at 493, 429 A.2d 590; citing, Harisiades v. Shaughnessy, 342 U.S. 580, 593, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1952). "[T]wo critical elements must be present for a criminal or penal law to be ex post facto: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." Weaver v. Graham, 450 U.S. at 28, 101 S.Ct. at 964 (citations and footnotes omitted).
In the instant case, Megan's Law applies to John Doe because of acts he committed years before its enactment. It is therefore retrospective. The real focus here is on the second element. That element requires the court to determine whether the affirmative burdens imposed by Megan's Law constitute punishment in the constitutional sense or are simply "unpleasant consequences."

*382 The mark of an ex post facto law is the imposition of what can fairly be designated punishment for past acts. The question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct, is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation, such as the proper qualifications for a profession. [DeVeau v. Braisted, 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960)]
Characterizing Megan's Law as a criminal or a civil statute does not advance our purpose here. "The notion of punishment, as we commonly understand it, cuts across the division between civil and the criminal law.... It is commonly understood that civil proceedings may advance punitive and remedial goals, and conversely, that both punitive and remedial goals may be served by criminal penalties." Austin v. U.S., ___ U.S. ___, ___-___, 113 S.Ct. 2801, 2805-6, 125 L.Ed.2d 488 (1993); citing, U.S. v. Halper, 490 U.S. 435, 446, 109 S.Ct. 1892, 1901, 104 L.Ed.2d 487 (1989). The question is therefore not whether Megan's Law imposes civil or criminal sanctions, but whether the duties imposed by the registration requirements of Megan's Law and the implications of community notification can be fairly characterized as punishment. Ibid. and fn. 7; see also fn. 6 in that case explaining the proper use of the so called Kennedy v. Mendoza-Martinez, criteria found in 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) and U.S. v. Ward, 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980); Trop v. Dulles, 356 U.S. 86, 96, 78 S.Ct. 590, 595-6, 2 L.Ed.2d 630 (1958); and see, Bae v. Shalala, 44 F.3d 489 (7th Cir.1995).
The Halper court, mentioned supra, had to decide whether a civil sanction constituted punishment within the context of the Double Jeopardy Clause. That analysis is useful for deciding the issue before the court today. According to the Halper court, punishment serves the twin aims of retribution and deterrence; neither of which are legitimate nonpunitive or remedial governmental objectives. Halper, 490 U.S. at 448, 109 S.Ct. at 1902. "From these premises, it follows that a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent *383 purposes, is punishment, as we have come to understand the term." Ibid. The Halper Court went on to hold that the Double Jeopardy Clause bars the government from subjecting a defendant who has already been punished for his crimes, to an additional civil sanction which "may not fairly be characterized as remedial, but only as a deterrent or retribution." Ibid.
In Bae, the 7th Circuit Court further interpreted the holding of Halper. In Bae, the court had before it the issue of whether a retroactive civil debarment penalty constituted punishment as prohibited by the ex post facto clause of the U.S. Constitution. The plaintiff, a former president of a generic drug company, had been permanently barred, pursuant to the Generic Drug Enforcement Act of 1992 ("GDEA"), from providing services, in any capacity, to a person that has an approved or pending drug product application. That law was enacted after the plaintiff had pled guilty to a felony which brought him within the reach of the GDEA.
In Bae, the circuit court rejected the defendant's argument that since debarment served both remedial and punitive goals it must be characterized as punishment. Bae's argument evidently relied on the Halper court's use of the word "solely" in the discussion leading to its holding. The circuit court's interpretation was much more pragmatic: "A civil sanction that can fairly be said solely to serve remedial goals will not fail under ex post facto scrutiny simply because it is consistent with punitive goals as well." 44 F.3d at 493.
The court in Bae began its analysis of the Act by looking at the legislature's stated purpose and the Act's overall scheme. It came to the conclusion that the Generic Drug Act serves compelling governmental interests unrelated to punishment. "The punitive effects of the [Generic Drug Enforcement Act] are merely incidental to its overriding purpose to safeguard the integrity of the generic drug industry while protecting public health." Ibid.
*384 In applying this line of cases to Megan's Law, I find that the registration and notification provisions do not amount to punishment in the constitutional sense. To begin with, the Legislature, in the preamble to Megan's Law, made it clear that it seeks to remedy the dangers posed by recidivism among sex offenders. The law targets people who prey on others as the result of mental illness, and those whose acts target the most precious and vulnerable members of society  children. State v. Howard, 110 N.J. 113, 130, 539 A.2d 1203 (1988). Aware of the devastation sex offenders cause victims and their families, the legislature found the need to set up a system of registration. That system will help law enforcement personnel identify risks and alert the public to potential dangers in their midst when notification is necessary for their protection. The primary goal of this system is to prevent sex offenses; the secondary goal is to promptly resolve incidents of sexual abuse and missing persons cases.
The goals of the law are not accomplished by means of punishment nor does the law "alter the standard of punishment which existed under prior law." See, State v. Ward, 123 Wash.2d 488, 499, 869 P.2d 1062 (1994). Megan's Law does not seek to alter the behavior of sex offenders or to restrict their movement; it does not forbid them from holding jobs or becoming productive members of society; it does not impose heavy fines or penalties; and, it does not increase the term of imprisonment or parole. The cost of compliance amounts to minutes of their time per year and perhaps the cost of postage or bus fair. It only seeks to protect the public. Any punitive effects are incidental to the legislature's overriding purpose of safeguarding the public.
The legislative scheme also supports the finding that Megan's Law does not seek to punish sex offenders. The Law provides for three levels of notification. As the danger of recidivism increases, the scope of notification is expanded. If a person is found to be a low risk to society, their presence is only made known to law enforcement agencies. Those people will not be subject to the public notification provisions. The law is designed so that it is no *385 more intrusive into an offender's life than is necessary to achieve its purpose. This scheme reflects the legislatures efforts to regulate a perceived danger and not to punish all sex offenders.
The tragedy that gave rise to Megan's Law also sheds some light on the legislative intent. When seven-year-old Megan Kanka was allegedly lured into the house of a previously convicted sex offender to be raped and killed, the community expressed outrage that a person with his history could be loose in their midst without their knowledge. Megan and her family were defenseless against an invisible enemy. Because of this and several other similar incidents, the legislature enacted this law for the specific purpose of providing parents and others with a fair warning.
History also supports the argument that registration laws are not punitive. In 1952 the New Jersey legislature enacted a law that was not very different than Megan's Law. See N.J.S.A. 2A:169A-1 et seq., repealed 20 years later by L. 1971, c. 231, § 1, for reasons unrelated to the issues before the court today. The "Criminal Registration Act" required persons previously convicted of narcotics violations to register with the police in the municipality of their residence. Registrants were required to carry a card evidencing the fact that they were in compliance with the law and had to show this card to the police chief in any municipality they visited with the intention to stay more than twenty-four hours. The purpose of this law was to deal with the specific problem of recidivism among drug users and dealers. No other felons had to register.
Many municipalities in New Jersey eventually enacted their own, more burdensome versions, of the State's Criminal Registration Act. This led to the State Supreme Court's decision in State v. Ulesky, 54 N.J. 26, 252 A.2d 720 (1969), holding that the State had preempted the field. Our State Supreme Court, in deciding on the validity of the municipal registration act before it, made this telling statement: "Here we are dealing with an ordinance which imposes a burden upon persons convicted of crime. (We do not mean that the requirement for registration is intended to be *386 punitive; on the contrary, we assume the aim is solely to protect against the prospect of future criminal activity.)" Ibid. (parentheses in the original). No one could seriously argue that Megan's Law does not impose a burden; however, that burden is no more punitive today than it was in 1969. See also, In Re Petition of Carlos Santiago, 104 N.J. Super. 110, 119, 248 A.2d 701 (Law Div. 1968) (holding that the collateral consequences of having to register under the Criminal Registration Act did not increase the quality of the penal offense charged); State v. Garland, 99 N.J. Super. 383, 387, 240 A.2d 41 (Bergen Cnty Ct. 1968) (real complaint with the act is that it causes an inconvenience and a hardship  not punishment); and, State v. Ulesky, 100 N.J. Super. 287, 299, 241 A.2d 671 (1968) ("no doubt" that registration casts a burden upon registrants).
The one thing that the Criminal Registration Act did not have is a public notification provision. Plaintiff has argued that the public notification provision (i.e., Tier's II and III) makes this law punitive and would no doubt argue that notification distinguishes it from the old Criminal Registration Act. I disagree. The two laws were enacted at different times to combat different evils. The Criminal Registration Act only applied to narcotic convictions. Most such offenses are considered to be victimless crimes. It was reasonable for the legislature to believe that only marginal benefit would come from notifying the public of a registrant's presence. (In fact, it may have only served to increase a drug dealer's customer base.) In contrast, the notification provisions of Megan's Law are directly related to the evil the legislature seeks to regulate: potentially dangerous sex offenders living among an unsuspecting community. The notification provision is directly related to the regulatory purpose and is no more burdensome than is necessary to accomplish that purpose.
The last issue I will address with respect to the arguments that Megan's Law is a punishment in disguise, has to do with its placement in the statutory law books. I agree with Judge Sedwick's reasoning in the unpublished opinion/order signed on July *387 27, 1994, under the caption, Rowe v. Burton, 884 F. Supp. 1372 (D.Alaska 1994):
the court finds this argument suffers from a shortcoming similar to an argument relying on a legislative expression of purpose. It fails to focus on the substance of what the legislature has done. Placement of a statutory provision in a particular title may reflect nothing more than a perception that the placement will facilitate indexing. Here, whether the law in question is punitive or not, it is undeniably directly associated with certain criminal convictions, and it is perfectly logical to place most of it in [Title 2C]. It may be added that [Title 2C] contains many provisions which are not punitive in character.
The legislature's clear and unambiguous intent in enacting Megan's Law was to protect the public from otherwise unidentifiable dangers. The legislature did not seek to punish John Doe or others similarly situated. Any retributive or deterrent effects are merely incidental to the overriding purpose. If the heavy fines, years of imprisonment and the damage to social status caused by a conviction do not deter sex offenders, then I fail to see how Megan's Law will have any significant deterrent effect. I also believe any retribution delivered by Megan's law is minimal at best. Megan's Law therefore does not violate the ex post facto clauses of the State or Federal Constitutions.
Building on this holding, I can now address, with more brevity, the challenges that Megan's Law, as applied to John Doe, violates the ban on bills of attainder, the prohibition against cruel and unusual punishment and the Double Jeopardy Clause.

Bills of Attainder
The plaintiff has argued in his brief that Megan's Law violates the ban on bills of attainder. A bill of attainder is a legislative act which applies "either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial...." U.S. v. Lovett, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946). This prohibition only applies to legislatively imposed punishments and does not apply to regulations. Thus, in Hawker v. People of New York, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898), the Supreme Court held that barring persons previously convicted of felonies from the practice of medicine was not in derogation of the ex post facto or *388 bill of attainder clauses because it was a legitimate regulatory measure and not a punishment for past crimes.
I have already determined that Megan's Law is a legitimate regulatory measure and is not a punishment for past crimes. It is for those reasons that I hold it is not in violation of the ban on bills of attainder.

Cruel and Unusual Punishment
The plaintiff argues that Megan's Law violates state and federal constitutional prohibitions against cruel and unusual punishment. In deciding whether the Eighth Amendment prohibited the government from permitting automatic denationalization of an Army deserter in wartime, the Supreme Court performed the same type of analysis as I did in deciding whether Megan's Law imposed punishment under an ex post facto analysis. The Court explained as follows:
Each time a statute has been challenged as being in conflict with the constitutional prohibitions against bills of attainder and ex post facto laws, it has been necessary to determine whether a penal law was involved, because these provisions apply only to statutes imposing penalties. In deciding whether or not a law is penal, this Court has generally based its determination upon the purpose of the statute. If the statute imposes a disability for the purposes of punishment  that is, to reprimand the wrongdoer, to deter others, etc., it has been considered penal. But a statute has been considered nonpenal if it imposes a disability, not to punish, but to accomplish some other legitimate governmental purpose. The Court has recognized that any statute decreeing some adversity as a consequence of certain conduct may have both a penal and a nonpenal effect. The controlling nature of such statutes normally depends on the evident purpose of the legislature. The point may be illustrated by the situation of an ordinary felon. A person who commits a bank robbery, for instance, loses his right to liberty and often his right to vote. If, in the exercise of the power to protect banks, both sanctions were imposed for the purpose of punishing bank robbers, the statutes authorizing both disabilities would be penal. But because the purpose of the latter statute is to designate a reasonable ground of eligibility for voting, this law is sustained as a nonpenal exercise of the power to regulate the franchise. [Trop v. Dulles, 356 U.S. 86, 95, 78 S.Ct. 590, 595-6, 2 L.Ed.2d 630 (1958) (footnotes omitted).]
Once the Court determined that the statutory purpose was simply to punish deserters, it went on to decide whether such a punishment was cruel and unusual. I have already held that the *389 registration and notification requirements of Megan's Law are not punishments. Those provisions were enacted to accomplish the legitimate governmental purposes of protecting children and other would-be victims of sex offenses and to aid law enforcement agencies in the prevention and detection of crimes. Since the burdens imposed by this statute are not punishment, it follows that they cannot be cruel and unusual and do not violate the State or Federal Constitutions.

Double Jeopardy
John Doe argues that the defendant's actions constitute a form of punishment that violates the Double Jeopardy Clause of the U.S. Constitution and Art. 1 par. 11 of the State Constitution. The double jeopardy clause provides three constitutional protections. It protects against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and it protects against multiple punishments for the same offense. North Carolina v. Pearce, 395 U.S. 711, 716, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). Since New Jersey courts have consistently interpreted state constitutional double-jeopardy protection as co-extensive with the guarantee of the federal constitution, there is no need for two separate analyses. State v. Dillihay, 127 N.J. 42, 47, 601 A.2d 1149 (1992).
The plaintiff argues that the registration and notification provisions of Megan's Law, as applied to him, impose punishment for crimes he has already been punished for. This, he argues, is in violation of the prohibition against multiple punishments for the same offense.
Since I have already found that the registration and notification provisions do not rise to the level of a punishment, there is no need to elaborate here. Megan's Law does not subject the plaintiff to double jeopardy.

*390 Violation of Plea Agreement
This argument sounds in contract theory. John Doe entered into a plea agreement with the State in July 1985 and claims he completed his obligations pursuant to the agreement on or about June 1992. He argues that the defendant now seeks to extract additional, unnegotiated demands out of him.
Sometimes a defendant, after discovering that he will be subject to consequences he did not bargain for, seeks to have his plea vacated. In those situations courts have recognized that defendants cannot always be fully charged with all of the collateral consequences of entering into a plea bargain. "What is crucial is that the plea bargain has been fairly reached and that defendant's reasonable expectations drawn from the terms of the bargain have been fulfilled." State v. Taylor, 80 N.J. 353, 364, 403 A.2d 889 (1979). I believe that the plaintiff's reasonable expectations with respect to his plea agreement have been fulfilled. The state has not imposed new conditions or punishments on him.
Reference to the line of cases dealing with vacating pleas is helpful for our purposes because it necessarily suggests consequences that might be considered a breach of the State's performance. In State v. Heitzman, 209 N.J. Super. 617, 508 A.2d 1161 (1986) the Appellate Division held that the defendant should not be relieved of his plea just because the judge did not advise him that his plea would trigger automatic statutory forfeiture of his public employment. The court stated:
We adhere to our prior decision in State v. Reid, 148 148 N.J. Super. 263, 266 [372 A.2d 626] (App.Div.), certif. den. 75 N.J. 520 [384 A.2d 500] (1977), that defendant need be informed only of the penal consequences of his plea and not the collateral consequences, such as loss of public or private employment, effect on immigration status, voting rights, possible auto license suspension, possible dishonorable discharge from the military, or anything else. See State v. Riggins, 191 N.J. Super. 352 [466 A.2d 981] (Law Div. 1983), and the many authorities cited there.
As the discussion on punishments concluded, Megan's Law does not impose new penal consequences. The new burdens imposed are collateral consequences. This is especially evident when viewed in light of the examples of consequences at risk in *391 the cases cited. The burden of having to register and the consequences of being subject to the notification provisions do not rise to the level of an automatic loss of employment, deportation or a dishonorable discharge. The new burdens imposed on the plaintiff by the State are collateral consequences which do not violate the terms of his plea agreement. The State has not breached its agreement.
I have held that Megan's Law does not impose punishment on the plaintiff. However, our analysis does not end there. Megan's Law clearly does impose certain burdens on the plaintiff. He must visit a police department and register. He must then update that information every 90 days for at least the first year following the effective date of Megan's Law. And, he must also report any change of address to the police. In addition to those affirmative burdens, there is a possibility that the plaintiff's convictions and presence in the community would be made public. I must therefore decide whether or not the burden imposed by Megan's Law is unconstitutional.
The plaintiff has suggested three ways in which these burdens run afoul of constitutional law. He argues that the burden infringes on his fundamental right to privacy, that the classifications and unequal treatment resulting from this legislative act violate the Equal Protection Clauses, and that it denies him due process.
I will address these issues in the order presented.

Privacy
The plaintiff claims that Megan's Law "essentially classifies repetitive and compulsive behavior as a mental illness." See, "Fifth Count" of First Amended Complaint. Building on this, he asserts that N.J.S.A. 30:4-24.3 proscribes the publication of information concerning a mentally ill individual and therefore creates a right to privacy which is violated by several provisions of Megan's Law. Ibid. This argument will be addressed with other due process issues towards the end of this opinion.
*392 In the plaintiff's brief, however, he does argue that the Federal and State Constitutions prohibit the State from disseminating information about his prior conviction and term of incarceration. He concedes that New Jersey has the right to continue its practice of notifying the public and the victims of the pending release of an inmate. See the Defendant's Brief In Support of Her Summary Judgment at 9-11 for an in depth discussion of New Jersey's laws and traditions in this area of criminal practice. However, the plaintiff claims that the State's rights end once the defendant has served his time and finished his parole. It is at this point, he argues, that the Constitution weighs in his favor and protects him against further intrusion into his "privacy."
I do not agree that the Constitution provides such broad protections in the area of privacy. In Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the plaintiff sued several police chiefs under 42 U.S.C. § 1983, alleging that their actions, under color of state law, deprived him of his constitutional rights. In that case, the defendants printed fliers which displayed the name and picture of persons they believed to be "active" shoplifters. The fliers were then distributed to local store owners. The plaintiff was included on the flier because he had been arrested for shoplifting, in spite of the fact that the charges against him had been dismissed.
In reaching the decision that this publication of personal information was not protected by the Constitution, the Court reviewed previously defined areas of privacy. Those areas are in matters relating to marriage, procreation, contraception, familial relationships, child rearing and education. Paul v. Davis at 712, 96 S.Ct. at 1166. The Court then characterized the plaintiff's privacy challenge as claiming that the State may not publicize a record of an official act such as arrest. Ibid. It stated, "None of our substantive privacy decisions hold this or anything like this, and we decline to enlarge them in this manner." Ibid.
One year later, in Whalen v. Roe, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), the Supreme Court recognized two kinds of *393 privacy interests. "One is the interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." Id. at 598, 97 S.Ct. at 876 (footnote citations omitted).
In Whalen, New York passed legislation which established a data bank to collect information on all persons taking a certain class of prescribed drugs. The information was made confidential by the same law and was used mainly for law enforcement purposes. Some of the drug users and their doctors brought suit, claiming that the law infringed on their right to privacy. The Court found that the state's interest in combating drug related crimes outweighed the prescription drug users' privacy interest. In so holding, the Court allowed the legislature great leeway in experimenting with the law.
In this case, the State's right to gather information cannot seriously be challenged. Most, if not all, of the information is already part of the public record. Tier I registration is less of an intrusion into privacy than New York's prescription drug data base. In Whalen, information that was previously only known by a doctor, the patient, and a pharmacist, was exposed to government scrutiny. In the instant case, Tier One registration compiles information already publicly available. See, e.g., N.J.S.A. 30:4-123.48(g), N.J.S.A. 30:4-123.45(b)(5) and N.J.S.A. 52:4B-44. See also, Lambert v. California, 355 U.S. 225, 228, 78 S.Ct. 240, 243, 2 L.Ed.2d 228 (1957) (registration information required in California's Registration Act was merely a compilation of former convictions already publicly available).
The real challenge here is to public dissemination of information pursuant to Tier Two and Tier Three notification. It is therefore necessary to examine Megan's Law to see exactly what information will be exposed to the public.
N.J.S.A. 2C:7-5 authorizes the release of "relevant and necessary information regarding sex offenders to the public when the release of the information is necessary for public protection in accordance with" N.J.S.A. 2C:7-6 et seq. The State has submitted *394 the "Community Notification Form" which was developed by the Attorney General in compliance with that mandate. That one page form indicates that the following information will be released if a registrant is subject to Tier II or Tier III notification: name, crimes, current photograph, physical description, vehicle information, address and place of employment or schooling. See, Defendant's Brief in Opposition to Plaintiff's Application for a Preliminary Injunction at Exhibit E.
A person's name and the fact that he or she has been convicted of a crime is already publicly available and has never been held to be protected. See, e.g., Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) (holding the Constitution prohibits State from penalizing publication of name of deceased rape victim obtained from public records); Paul v. Davis, supra, (holding no constitutional privacy right affected by publication of name of arrested but untried shoplifter); The Florida Star v. B.J.F., 491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) (unconstitutional for state to impose liability on newspaper for publishing name of rape victim); and, Jones v. Murray, 962 F.2d 302 (4th Cir.1992) (subsequent to a lawful arrest a person's identification becomes a matter of legitimate state interest and he can hardly claim privacy in it  interest is in solving past and future crimes). In fact, New Jersey has a long-standing tradition of releasing this exact information. Since 1979, the Parole Board has been required to give public notice prior to considering any adult inmate for release. The inmate's name, crimes, and place of conviction are sent to the prosecutor's office, police departments and are released to the press pursuant to N.J.S.A. 30:4-123.48(g) and N.J.S.A. 30:4-123.45(b)(5). In 1989, New Jersey expanded the scope of notice when it adopted a policy of providing victims with notice of an inmate's release. N.J.S.A. 52:4B-44.
Information other than the fact of his arrest will also be publicized. This information is all typically available through several different public agencies or records. See, e.g., Motor Vehicle Registration and Licensing laws at N.J.S.A. 39:3-4 et seq. *395 and N.J.S.A. 47:1A-2. And as to the photograph, Plaintiff does not have a reasonable expectation of privacy in matters necessarily exposed to public view. See, e.g., United States v. Dionisio, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1969).
In Whalen, Justice Stevens specifically stated that the Court did not decide "any question which might be presented by the unwarranted disclosure of accumulated private data  whether intentional or unintentional  or by a system that did not contain comparable security provisions." Id. at 604, 97 S.Ct. at 879. This statement and the two clashing concurring opinions reflect the Court's struggle with this area of Constitutional law and serve to suggest that caution must be taken when dealing with interests not specifically provided for in the law or the Constitution. I am therefore not ready to find that a convicted sex offender has a privacy interest which prevents the State from publicizing information when notification is deemed necessary for public protection.
I believe that although some safeguards must be afforded before the plaintiff could be subject to the public notification provisions, he is not ultimately protected by a constitutional privacy interest.
For these reasons, I hold that the State has not infringed on Plaintiff's right to privacy.

Equal Protection
The plaintiff further argues that Megan's Law does not treat him equally as to all other convicted offenders released from prisons in violation of the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution and Art. 1, par. 1 of the Constitution of the State of New Jersey.
The U.S. Constitution requires that similarly situated persons be treated similarly under the law. Thus, when a state adopts suspect classifications or attempts to regulate a fundamental right, the law is subject to strict scrutiny. Englewood Cliffs v. Englewood, 257 N.J. Super. 413, 466, 608 A.2d 914 (App.Div. 1992), *396 citing inter alia, City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); and Brown v. City of Newark, 113 N.J. 565, 552 A.2d 125 (1989). When neither of these situations is present, however, legislative acts are subject to a much more liberal standard of review. Ibid.
The classification challenged by John Doe is that of sex offenders who have been determined to be repetitive and compulsive. Neither sex offenders, felons or even the mentally ill have ever been protected as a suspect or quasi-suspect class. See, e.g., City of Cleburne v. Cleburne Living Center, supra, and the other cases cited in Englewood Cliffs v. Englewood at 466-7, 608 A.2d 914. In grouping criminals for legislative purposes, when a fundamental right is not at stake, the legislature is only required to act rationally. See, e.g., State v. Wingler, 25 N.J. 161, 175, 135 A.2d 468 (1957); citing, Mahoney v. Parole Bd. of New Jersey, 10 N.J. 269, 90 A.2d 8 (1952) ("The constitutional power of the Legislature to make reasonable classification of criminals for purposes of sentence and release is beyond question.") The question for the court is whether there is a "rational connection between the State action and the legitimate state interest sought to be achieved." Englewood, supra, at 467, 608 A.2d 914.
Whether the legislature could have gone farther is not the question. The class it did select is identified by the state court in terms which clearly show that the persons within the class constitute a dangerous element in the community which the legislature in its discretion could put under appropriate control. As we have often said, the legislature is free to recognize degrees of harm, and it may confine its restrictions to those classes of cases where the need is deemed to be clearest. If the law `presumably hits the evil where it is most felt, it is not to be overthrown because there are other instances to which it might have been applied.' [State v. Wingler at 175, 135 A.2d 468, citing, Minnesota ex rel. Pearson v. Probate Court, 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940).]
"The principles expressed in the Pearson case have been echoed in many decisions rejecting the contention that state statutes regulating sex offenders violated the equal protection clause of the Federal Constitution." Id. at 176, 135 A.2d 468 citing numerous examples.
*397 The legislature must be given broad discretion to determine public interest demands and the measures necessary to secure and protect that interest. See, e.g., State v. Ward, 123 Wash.2d 488, 869 P.2d 1062 (1994) (upholding Washington state's sex offender statute against an Equal Protection Clause challenge). The State has a legitimate interest in protecting the public from sex offenses and in aiding law enforcement in the prevention and detection of those crimes. See, e.g., Abbott v. Los Angeles, 82 ALR2d 385, 53 Cal.2d 674, 3 Cal. Rptr. 158, 349 P.2d 974 (1960) (discussing reasons why the California legislature enacted a sex offender registration act in 1947 which did not require any other criminals to register).
The Equal Protection Clause does not prevent the New Jersey legislature from addressing the problem of recidivism by sex offenders and leaving the problem of recidivism by other offenders for another day. See, e.g., State v. Garland, supra at 387-8, 240 A.2d 41 (courts do not decide on the expediency, wisdom or propriety of legislature's action on matters within its power); State v. Ulesky, 100 N.J. Super. 287, 295, 241 A.2d 671 (Monmouth Cnty.Ct. 1968) (discussion and cites to cases dictating deference to legislative choices); and, Abbott v. Los Angeles, supra at 395, 3 Cal. Rptr. 158, 349 P.2d 974 (discussing legislature's authority to deal with one group of recidivists at a time).
The legislature has acted on the dangers posed by recidivism in sex offenders. Public safety is unquestionably within the legislature's powers and protecting the public from recidivistic sex offenders is a legitimate state interest. The fact that the legislature chose to deal with recidivism in one group of offenders and not another does not render the Act unconstitutional. Megan's Law must be upheld as rationally related to a legitimate state interest.

Due Process
Plaintiff has made numerous due process arguments throughout his brief. While I do agree that the plaintiff has a due process *398 interest at stake here, I do not necessarily base my holding squarely on the reasons advanced by the plaintiff.
Plaintiff argues that as a mental health patient, his records are protected as confidential by New Jersey law. He cited N.J.S.A. 30:4-24.3. That section of Title 30 makes all certifications, applications, records and reports directly or indirectly identifying an individual presently or formerly receiving services in noncorrectional institutions under Title 30 confidential. But Avenel is clearly a correctional institution, not a mental hospital. R. 3:21-3 however, does protect Avenel reports, and I believe it deserves some discussion. The last sentence of that rule states: "The report of the Diagnostic Center shall be confidential unless otherwise provided by rule or court order." These restrictions do apply to the plaintiff's records and I believe, without deciding, that due process would require the state to provide Doe with a hearing before making any part of that report public.
I am not holding that Megan's Law violates Doe's right in the confidentiality of his medical history because I do not think there is any immediate threat of release. Megan's Law provides for the release of information that is necessary for the public protection  not for information that is protected by the law as confidential. This understanding of the law is evident in the Attorney General's guidelines. The form developed for use in notifying the public only provides information on past crimes and information pertinent to identification. The guidelines also recognize that psychological assessments and other records obtained from the Department of Corrections and the Department of Human Services are to be kept confidential. See page 3 of the guidelines. Since Megan's Law does not threaten to expose confidential records, I will not decide on that issue.
However, on a related due process issue raised by the plaintiff, I conclude that plaintiff is on point. Plaintiff has argued that due process entitles him to a hearing before he can be subjected to Megan's Law. Insofar as Tier II and Tier III notification is at stake, I agree. I believe that fundamental concepts of justice and *399 due process demand that the plaintiff be given a hearing before any public notification under Tier II and III takes place. My reasons follow.
In New Jersey, the treatment and detention of sex offenders has always been handled with the utmost caution and concern. In 1957, the Supreme Court was presented with a due process challenge to the Sex Offender Act (N.J.S.A. 2A:164-3) which was the predecessor to N.J.S.A. 2C:47-1 et seq. That Court held that before a convicted sex offender could be sentenced to a diagnostic treatment center, he or she must be given a pre-sentence hearing. State v. Wingler, 25 N.J. at 179, 135 A.2d 468. (Title 2C has been amended to conform with that decision.) The Court declined to base its holding on the due process clause but did suggest that arbitrary use of the diagnostic reports in sentencing could infringe on fundamental concepts of justice and due process. Without resorting to the Constitution, the Court held that a pre-sentence hearing was necessary to avoid arbitrary action and to advance the interests of justice.
In 1970, the Court had to decide on the scope of the pre-sentence hearing it established in State v. Wingler. In State v. Horne, 56 N.J. 372, 267 A.2d 1 (1970), it held that Wingler and its implementing rules required a plenary judicial hearing with full opportunities to confront witnesses, cross-examine and to present evidence. It rejected the argument that the hearings would unduly burden the judicial system because it found that the risk of injustice was far too great to proceed without proofs. Id. at 376, 267 A.2d 1.
In a more recent case, the Supreme Court decided a due process challenge to the Title 2C. In State v. Howard, 110 N.J. 113, 539 A.2d 1203 (1988), the defendant argued that he had a due process liberty interest in averting the stigma associated with his classification as a "repetitive and compulsive" sex offender. The State argued, in part, that any stigma attached at the time of conviction, and not as a result of an ADTC sentence. Id. at 128-129, 539 A.2d 1203. The Supreme Court found "that classification *400 as a `repetitive' and `compulsive' sex offender under N.J.S.A. 2C:47-3a inflicts a greater stigma than that resulting from the conviction for a sex offense." Ibid. Although the Court found the added stigma to be slight, it stated the stigma should be considered in determining the process due to a defendant before imposition of an Avenel sentence. Id. at 129, 539 A.2d 1203.
These cases involved pre-sentence situations under the Sex Offenders Act and clearly implicated the defendant's liberty interests in the length of time he might spend behind bars and are, therefore, factually distinguishable. I am nonetheless satisfied that the requirement of public notification under Megan's Law also implicates a sufficiently significant liberty interest to mandate the requirement of an in camera judicial hearing before Tier II or Tier III notification may proceed.
Recall that Doe has been free of any specific State interest in or control of his life, social relationships and economic affairs since June 1992. In the aura of that freedom, Doe has slipped anonymously into the life he chooses  so much so, that even in the glare of the publicity generated by this very case, only his counsel knows who he is. Therefore, as a practical matter, except as he decides to reveal his past, Doe has not been stigmatized or prejudiced by it. Furthermore, presumably, from the facts of his crime, Doe is or may be a homosexual, many of whom, because of societal prejudice against such a non-traditional gender orientation, are justifiably cautious in "coming out of the closet." Public notification, then, in Doe's case, has the capacity to involuntarily tear asunder the cloak of anonymity within which Doe has chosen to clothe himself and in which, at least before Megan's Law, the State asserted no interest. Public notification may, therefore, reasonably be expected to revive the burden and stigma of his past crime, to expose him to the unlawful but nonetheless real prejudice visited upon those of a non-traditional gender orientation, and to result in Doe's bearing those burdens whenever and wherever in New Jersey Doe decides to move until 2007.
*401 Thus, while the State might have the power to forever hold a convicted sex felon under some form of parole surveillance (I do not hold that it does, in fact, have such power or that it would be wise policy to exercise it), once the State has released him from such control I hold that it deprives Doe of a liberty interest to assert it through public notification of his name, past crime and whereabouts in the community. Cf. Vitek v. Jones, 445 U.S. 480, 491-494, 100 S.Ct. 1254, 1263-1264, 63 L.Ed.2d 552 (1980) (holding that stigma associated with a voluntary commitment to a mental hospital is a deprivation of liberty that triggers due process rights); State v. Howard, supra 128-129, 539 A.2d 1203. But that is not the only liberty interest affected by public notification. Notification will necessarily extend that stigma and notoriety to innocent members of the offender's family with whom he may choose to live or to others (including family members) who may themselves be the victim of the offense. Finally, it has the high likelihood of creating a hostile environment within the offenders neighborhood which may force him to move denying him the freedom to live where his social adjustment may have the best chance. Each of these impacts, taken individually or in combination, can reasonably be expected to have a prejudicial effect on the offender's course of treatment; his general rehabilitation on which the State has spent so much during his incarceration at Avenel; his ability to obtain or hold a job; and to otherwise achieve a "satisfactory social adjustment"  the very basis upon which Doe was paroled.
When the plaintiff was confronted with an Avenel sentence, he waived his right to a plenary hearing. He claims he felt that since he was to be imprisoned anyway, he might as well accept help. Perhaps if he knew he would be subjected to Megan's Law, he would not have waived his right to a hearing. In any event, I believe that both the community and individual interests, as well as fundamental concepts of fairness and due process, require that Doe be given a pre-notification hearing in the event the prosecutor determines that Tier II or Tier III notification may be appropriate.
*402 In deciding what process is due, one must balance the interests involved. In Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court identified three factors that should be considered in this type of analysis. Those factors are:
First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
Id. at 335, 96 S.Ct. at 903.
The private interests in this case are threefold. First, registrants like Doe have an interest in not having the stigma of their convictions perpetuated by the State and extended to their families. Secondly, they have an interest in remaining anonymous in order to better their chances at re-building their lives (or what the plaintiff calls starting over). And lastly, they have an interest in avoiding what is likely to be a hostile community reaction to their presence.
The State's interest encompasses the individual's interests in many ways. The State also has an interest in seeing that John Doe, and others like him, become responsible taxpaying members of society. The State is also interested in protecting its individual members from reasonably foreseeable harm to their property or liberty interests. In particular, the State has a responsibility to protect members of society, especially children, from criminal acts. It therefore has an interest in exposing ex-offenders when the danger from, or risk of, recidivism is present.
Both parties have an interest in the speed and focus of the hearing. The State's interest is in exposing moderate to high risk recidivists without undue delay. The registrant's interest is in not being casually exposed because of haste or inaccurate records. And as always, the State has to be concerned with the cost of the necessary work incident to an accurate risk assessment.
In Board of Ed., Plainfield v. Cooperman, 105 N.J. 587, 523 A.2d 655 (1987), the Supreme Court used Professor Davis' list of *403 four elements necessary to a fair trial to evaluate how well existing procedures serve the identified interests. Those elements were adequate notice, a chance to review opposing evidence and to provide responsive proofs, opportunity to confront and to cross-examine witnesses, and an impartial deciding officer. Id. at 600, 523 A.2d 655.
In the instant case, these procedures are non-existent, let alone not clearly defined. Local prosecutors are given only the Attorney General's rather soft guidelines to help evaluate the risk of re-offense. The prosecutors, with the aid of local police agencies, evaluate information they obtain on a registrant. Besides the standard information given by the registrant, the prosecutors can access nonprivileged records from any other state agency, facility or institution. The prosecutor has broad and untrammeled discretion to decide what information he or she deems relevant or necessary. The prosecutor, with the aid of the guidelines and police input, then makes the final decision on what the risk of re-offense is and thereby the level and manner of notification.
The existing process is therefore inadequate. A registrant will presumably be told that his or her situation will be evaluated and that it may result in Tier II or Tier III notification. Thus, notice is indirectly given. However, none of the other three elements is present. The review procedure does not provide any opportunity to the registrant to be heard or to present evidence, nor does it provide any opportunity to confront or cross-examine witnesses. The last element of an impartial decider is also missing.
The Attorney General has argued that "the decision to leave risk assessment and means of community notification to the discretion of prosecutors and local police responsible for safety in the community is clearly an appropriate decision preserving the traditional `law of the land' with respect to the executive's role in preventing crime and protecting the public." Brief on Behalf of Defendant Deborah Poritz in Support of Her Motion for Summary Judgment at 52-53. The fact that prosecutors and police play the leading roles in protecting the public from crime is a good reason *404 why they should not be charged with this risk assessment function. They are likely to have a very strong bias towards community notification. Risk assessments are an inherently sophisticated business.[1] Any attempt to predict human behavior in an individual case is itself fraught with a high degree of risk. It is true that prosecutors do it routinely in connection with their traditional law enforcement role. When prosecutors decide whether to downgrade, what cases to present for indictment, whether to approve PTI, whether to demand the death penalty or what other appropriate sentence of disposition to recommend to the Court, they are exercising prosecutorial judgment based on an assessment of the risk of re-offense an offender presents and of other classic punitive goals.
However, in my opinion, the delegation to the county prosecutors to decide the risks presented by a discharged sex offender like Doe, for regulative and non-punitive public notification purposes, without any of the usual formalities attendant to Court proceedings, is overbroad, vests the decision in a partisan official and simply does not accord Doe procedural due process. The judicial hearing I envisage is akin to civil commitment hearings where the issue is whether the prospective committee is a "danger to himself, others or property" or to a risk assessment hearing under the Domestic Violence Act where the issue is the safety of *405 children during visitation. In both of these situations substantial liberty interests as well as protection of the public are at stake and the judicial role in the process is both central and clear.
That is not to say that the prosecutor should not have an important role to play in the matter; but, because notification treads, for the reasons stated, upon the liberty interests of Doe, I hold that the proper role of the prosecutor is that of presenter of the relevant evidence while leaving to the Court, under appropriate guidelines, the final judgment as to the degree of risk and the level and manner of notification. Judges are peculiarly well suited to the delicate task of weighing and balancing the private and public concerns inherent in risk assessments, and thus the level of notification merited by a particular case. To impartial and independent judges rightly belongs the sensitive task of weighing the competing concerns of constitutional due process against the demands for public safety.
Registrants should be provided the same opportunities to present evidence, cross-examine, and confront witnesses as at an ADTC pre-sentence hearing. The risk of injustice outweighs the costs associated with such a hearing in these cases. See, e.g., State v. Horne, 56 N.J. 372, 267 A.2d 1 (1970); and State v. Kunz, 55 N.J. 128, 259 A.2d 895 (1969) (where the challenged matter was crucial to sentencing risk of injustice is far too great to proceed without proof). Public notification has broad-reaching effects and is prone to abuse and irregular application. A judicial hearing will prevent possible abuses and protect against irregular application of the notification provisions.
In summary, then, the Court has identified in the penumbra between "punishment" and "unpleasant consequences" a protectible liberty interest vested in Doe under the 14th Amendment which mandates that he be given a fair, due process hearing before he may be deprived of that liberty. For the reasons stated, the Court declares those portions of Megan's Law applicable to John Doe constitutional, excepting only those provisions which may subject Doe to Tier II or Tier III public notification. Those *406 provisions are unconstitutional for the sole and limited reason that they do not provide Doe with a pre-notification due process fair hearing before the Superior Court and thus impermissible violate a protected liberty interest recognized by this Court. This constitutional defect does not affect any other provisions of the statutes known collectively as Megan's Law applicable to Doe and may easily be remediated by the Legislature. However, in order to afford Doe immediate relief and for the public interest sought to be furthered by these enactments, the Court under its inherent authority will afford Doe such a hearing under conditions hereinafter set forth.

Administrative Procedures Act
Having decided that the plaintiff is entitled to a pre-notification hearing I must decide on the validity of the Attorney General's guidelines. The guidelines will be an indispensable part of any further proceedings.
The Attorney General promulgated guidelines, necessary for the implementation of Megan's Law, pursuant to N.J.S.A. 2C:7-3 and 6. N.J.S.A. 2C:7-6 established a notification advisory council "to consult with and provide recommendations to the Attorney General concerning guidelines to be promulgated pursuant to section 3" of Megan's Law. That council is composed of 12 persons. Four were appointed by the Governor, four by the President of the Senate, and four by the Speaker of the General Assembly. N.J.S.A. 2C:7-3 required the Attorney General to promulgate guidelines and procedures for the notification provisions of Megan's Law. The deadlines for completing the guidelines was 60 days prior to the effective date of the act.
The Attorney General did promulgate the guidelines, after consultation with the Advisory Council, as required by the act. However, she did not follow the procedures for rule-making required by the Administrative Procedures Act.
The Administrative Procedures Act, N.J.S.A. 52:14B-1 et seq., demands that "each agency statement of general applicability and *407 continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency" be issued in accordance with the Act. N.J.S.A. 52:14B-2(e) and N.J.S.A. 52:14B-4. "Agency" is defined to include each of the principal departments in the executive branch of State Government and therefore includes the Department of Law. A rule which is not promulgated in the manner established by the act is not valid. N.J.S.A. 52B:14-4(d).
I must now determine whether the guidelines issued by the Attorney General, and required by Megan's Law, constitute administrative rules which should have been adopted in compliance with the Administrative Procedures Act. The Attorney General has argued that it is commonplace to use a committee such as the notification advisory council. I do not doubt that. Consultative bodies such as the council are provided for by section 14B:-4(e). However, utilizing such an advisory body was not intended as a substitute for compliance with the Act, in my opinion.
In Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 478 A.2d 742 (1984), the Supreme Court synthesized the existing case and statutory law governing this field. The test for determining whether the guidelines are an administrative rule within the meaning of the Act is as follows:
[A]n agency determination must be considered an administrative rule when all or most of the relevant features of administrative rules are present and preponderate in favor of the rule-making process. Such a conclusion would be warranted if it appears that the agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy. These relevant factors can, either *408 singly or in combination, determine in a given case whether the essential agency action must be rendered through rule-making or adjudication.
Id. at 331-332, 478 A.2d 742.
In balancing these factors I think it is clear that the Attorney General's guidelines constitute rules, and should have been adopted in accordance with the Administrative Procedure Act rule-making procedures. Nor do any of the traditional exceptions to required rule making under the APA apply in the case of these legislatively mandated guidelines. LeFelt, Administrative Law and Practice, 37 New Jersey Practice, Sections 32, 33, 34 and 35. For instance, they cannot be seen as merely a statement of the Attorney General's internal management or discipline. While, indeed, the guidelines do propose to "guide" the County Prosecutors' offices in implementing the three-tiered risk assessments and notification procedures, they obviously have an impact beyond those offices and affect the interests of the registrants and of the very communities they are designed to protect. Because of the fact that these guidelines will have an impact on members of the public they also cannot be viewed solely as an intra-agency directive between the Attorney General and the several County Prosecutors although they certainly serve in that capacity. Finally, of course, they do not represent a decision in a contested case nor have they been promulgated as an Attorney General Opinion.
In the instant case, the guidelines are intended to cover all persons convicted of certain sex offenses. It is important that the guidelines be applied generally and uniformly to all similarly situated sex offenders. The guidelines are prospective since they govern the future actions of the police and prosecutors of New Jersey, as well as sex offenders who must comply with this law for the first time. The guidelines represent a material and significant change from a clear past position on this subject matter. Before Megan's Law was enacted, the Office of the Attorney General did not make efforts to notify organizations or neighborhoods that a sex offender was living in their midst. There was a policy of notifying victims and police agencies of an inmate's release, and of allowing the press access to that information. However, that *409 policy could not be, and was not, interpreted to require state agencies to notify entire neighborhoods of an ex-convict's presence or of keeping the public updated on an offender's presence (i.e., address, description, place of employment, car, etc.) for a full 15 years after release. And finally, the guidelines represent the Attorney General's interpretation of the enabling law.
In applying the Metromedia criteria, I think it is clear that the guidelines issued by the Attorney General typify administrative rules. The administrative rule-making procedures are especially important when dealing with an area of law as fraught with controversy as this one is. The rule-making procedures provide the communities affected by this law, the departments charged with implementing it, and the offenders burdened with compliance, some opportunity to be heard and to participate in the formulation of the guidelines.
The failure to comply with the Administrative Procedure Act renders the guidelines invalid.
For all of the stated reasons given in this opinion the following orders are entered: (1) John Doe will register pursuant to the terms of Megan's Law no later than 5:00 P.M. on February 28, 1995; (2) Tier I notification may proceed; but, Tier II or Tier III notification is hereby restrained pending completion of the hearing ordered in paragraph (3) The Attorney General shall advise the Burlington County Prosecutor of the terms of this order and direct his compliance with it; (4) On a day to be fixed, and upon notice to the Court by the Burlington County Prosecutor that he has determined in Doe's case that Tier II or Tier III notification may be appropriate, the Court will conduct an in camera hearing on what degree of risk of re-offense, if any, Doe presents and what level and what manner of public notification shall be had, subject to the following conditions: (a) the hearing will not be scheduled until after the Attorney General has promulgated guidelines under the APA; (b) the hearing shall be on such notice to Doe as the guidelines prescribe but not less than fourteen (14) days; (c) Doe shall have the right to appear in person or through counsel, may *410 testify and present evidence on the issues both lay and expert, and cross examine witnesses; (d) the hearing will be conducted generally in conformity with those held pursuant to Rule 4:74-7(e) relating to civil commitments; provided, however, that the Attorney General's guidelines will be used to evaluate Doe's degree of risk together with any other relevant considerations and the Rules of Evidence will not apply except for valid claims of privilege; and (e) the State shall bear the burden of proof by a preponderance of the evidence; (5) The present Attorney General's guidelines are declared void and are hereby vacated; but they shall be promptly noticed for adoption pursuant to the Administrative Procedures Act with such revisions, amendments, and additions as the Attorney General, after consultation with the Advisory Council, deems appropriate; and (6) None of the above orders will be stayed pending appeal.
NOTES
[1] The Court finds it somewhat disturbing that the Legislature in its wisdom did not provide prosecutor offices with any additional resources to implement thorough risk assessments. Traditionally, in civil commitments and in domestic violence cases, the question of predicting future conduct of an individual has been perceived as the province of experts and they are routinely heard from and relied upon in both instances. Both situations are characterized by the idea that a person is unable to control his or her behavior as the result of some underlying active or latent mental or emotional disability or diagnosable character disorder. That same idea undergirds Megan's Law. Yet the law does not provide the prosecutor offices with professional help to assist them in evaluating the risk of re-offense and they must therefore make do with existing staff, whose training as lawyers did not include assessing the potential for recidivism by sex offenders. In my view these conditions will add to the "strong bias" in favor of notification. In other words there will be a practical presumption in favor of the highest risk level and Tier III notification.